CRAWFORD v. DAVIS.

Opinion delivered January 24, 1921.

1. INJUNCTION—RETAINING JURISDICTION FOR COMPLETE RELIEF.—A complaint which alleged that defendants were trespassing and committing waste upon plaintiff's lands, and were insolvent, and prayed for an injunction, gave jurisdiction to the chancery court; and, having acquired jurisdiction, that court did not err in retaining the same and determining the disputed·title to the lands.

2. ADVERSE POSSESSION—SUFFICIENCY OF POSSESSION.—Intermittent and fitful efforts by defendants to secure possession of lands held insufficient to show such continuous and notorious occupation of and dominion over the land as to indicate to the true owner an uequivocal intention to own and appropriate exclusively the lands to their own use.

Appeal from Independence Chancery Court; L. F. Reeder, Chancellor; affirmed.

W. K. Ruddell, for appellants. ·

1. Defendants' predecessors had been in possession of the lands for more than two years under a tax deed, and their possession was adverse and conferred a valid title. 79 Ark. 364; 126 Id. 86; 84 Id. 614; 60 Id. 499; 59 Id. 460. It is undisputed that Engles had been in possession for more than two years and that Andy Allen disclaimed his owning the land but stated that Engles did own it.

2. Two years' adverse possession makes a good title, regardless of whether appellees paid taxes. Appellees claim to have paid taxes for the year 1868. The record does not show this, but if it did it would make no difference. 79 Ark. 364. A statute of repose is not needed in favor of purchasers as valid sales. The validity of the

sale and precedent proceedings carries the title, and such statutes are unnecessary. 99 Ark. 364-5. Even if the tax sale were void, adverse possession for more than two years under a tax deed carries the title.

3. Tax sale under the description of the northwest quarter of southwest quarter of section 25 was not void. Judicial notice is taken by the courts of government surveys and descriptions, and hence there is and can be but one tract of land within the State in which the description here is applicable. 82 Am. St. Rep. 440.

Each tract of land shall be so described in the assessment for taxation as to identify it *if practicable* according to section and township. 64 Ark. 580; 12 Enc. of Ev. 302. This court is committed to the rule that a description may be good, although proof outside the government plats would have to be introduced to show that the description is sufficient. They think the government plat shows that there is such a description of land as the northwest quarter of the southwest quarter, but if it does not the description here is according to section or subdivision thereof and congressional township. The description is sufficient. 110 Ark. 571-4. The description can not be applied to any other tract and informs the owner and public with certainty of the tract intended. 79 Ark. 442-6. Evidence *aliunde* may be resorted to to identify the land. 79 Ark. 442.

The appellees admit that they paid taxes only on that part of the southwest quarter south of White River and west of the slough containing 21 35/100 acres, and the county surveyor stated that the southwest quarter south of White River and west of slough run up into the northwest quarter of the southwest quarter, and they admit that there is part of the northwest quarter of the southwest quarter that they did not pay taxes on. There is then a part of this land they did not pay taxes on, and they should have made a tender of the taxes before bringing suit. 35 Ark. 505; 50 *Id.* 384; 4 Crawford's Digest,

4845. Since no tender was made, the complaint should have been dismissed.

4. The northwest part of section 25 could not include any part of the southwest quarter. In the conveyance of land by deed in which land is certainly bounded, it is very immaterial whether any quantity is expressed, for the description by boundary is sufficient and conclusive. 3 Ark. 18, 58. The survey by the county surveyor is *prima facie* correct, and the surveyor stated that there was a nortwest part of the southwest quarter of section 25. Kirby's Digest, §§ 1142, 1145. He further stated that the northeast part of section 25 did not and could not extend into the southwest quarter. This is undisputed and an established fact. Notice was given to all owners of adjoining lands of the survey. Kirby's Digest, § 1135. The testimony shows that Andy Allen was notified.

5. Appellees are barred by laches from bringing this suit. Ann. Cases 1918 B 452-6; 95 Ark. 178; 103 *Id.* 58; 136 *Id.* 378; 103 *Id.* 58-60.

6. The chancery court had no jurisdiction, and the demurrer to jurisdiction should have been sustained. The Engles were in possession and had paid taxes for more than seven years. Kirby's Digest, § 5057; 64 Ark. 580. The court erred in refusing to transfer the case to the law court and in holding there was no such tract as the northwest quarter and that the assessment was void.

*Ernest Neill* and *Samuel M. Casey,* for appellees.

1. The alleged forfeiture for taxes was void on its face, as there was no such tract. A tax deed for lands not subject to taxation passes no title, is not even color of title. 95 Ark. 65. This case is conclusive under appellants' claim of adverse possession under the tax deed, and the northwest quarter of the southwest quarter would of necessity embrace a part of the 39-acre swamp land parcel which Allen purchased from the State in 1871, which was two years after the alleged forfeiture. The land in the tax deed is not susceptible to identification, and appellants would be required to hold actual posses-

sion of the entire forty acres for seven years before they acquired title. The fence mentioned and the river constituted a complete enclosure by the Allens. 76 Ark. 529. The burden of establishing title through the tax sale and possession thereunder was on appellants. 117 Ark. 579. The proof on actual possession is vague and indefinite. The proof falls short of establishing actual hostile and exclusive possession for two years in appellants. The proof must be clear and convincing. 126 Ark. 86; 92 *Id.* 321; 75 *Id.* 593; 68 *Id.* 551. Possession to confer title must be adverse, intentional, actual and continuous. An interruption of possession is a new point from which the statute will run. 27 Ark. 77; 48 *Id.* 277; 22 *Id.* 79. To acquire title to woodland by adverse possession, there must be actual use and occupancy and exclusive appropriation and ownership. 81 Ark. 296. Engles never held actual possession exclusive of the Allens for two years.

2. The doctrine of laches does not apply.

3. The seven years' payment of taxes act does not apply. The deed is void on its face, and there is no such legal subdivision in section 25, and appellees have paid taxes under the description employed by the government surveys; besides the lands were not wild and unoccupied or uninclosed, as they were inclosed under the Allen fence, and the statute does not apply. 80 Ark. 435; 81 *Id.* 258. The lands were accretions and belonged to the original entryman or grantees. 88 Ark. 38; 104 *Id.* 154; 49 U. S. (Law. Ed.) 857; 18 Rose's Notes to U. S. Rep. 1413; 1 R. C. L., p. 239, § 14.

4. The chancery court had jurisdiction, as Underdown and Crawford were hopelessly insolvent, and irreparable injury was proved. 14 R. C. L. 347, § 49. The facts of the case fall within 75 Ark. 286; 92 *Id.* 118; 219 S. W. 742.

WOOD, J. The appellees instituted this action against the appellants in the Independence Chancery Court on the 8th day of July, 1919. They alleged that

appellee, Ralph A. Allen, was the owner of certain tracts of land in Independence County, subject to the dower of his mother; that the other appellees were his tenants. The lands, including the land in controversy, are described in the complaint. The appellees deraigned title through mesne conveyances from the United States Government. Appellees alleged that appellants are committing numerous trespasses by cutting timber so near the river as to cause the land to wash; that appellants are insolvent, and, unless restrained, will cause appellees irreparable injury. The appellants answered denying all the allegations of the complaint and set up title in themselves to the land. They deraigned title through one John Henry Engles. They alleged that the lands were forfeited for the nonpayment of taxes for the year 1866, and that Engles purchased the same at a sale for such taxes on the 28th of December, 1885; that Engles went into possession for two years before the commencement of the action, and that he and his successors in title for more than seven years had paid the taxes on the tract in controversy.

The appellees filed a reply in which they denied that there was any tract of land known to the public survey as that described in appellants' answer and alleged that the tract of land in controversy was not subject to taxation at the time the same was forfeited, being swamp and overflow land belonging to the State. They alleged that the sale for taxes, under which appellants claimed, was null and void for various reasons unnecessary, in the view we have of the case, to set forth.

On the issue of title by adverse possession to the land in controversy, H. Underdown, a witness for the appellants, testified substantially as follows: · That he trapped on the lands in the years 1886 and 1887, and that Engles claimed the land and called witness' attention to some yearlings he had thereon; that it was fenced with two and three strands of barbed wire attached to

posts where the trees were too far apart. During this time he did not see the Allens on the land.

Witness Flynn testified that he saw Engles making a survey of the land in December, 1885, and later saw him fencing the land with barbed wire in February, 1886; that Engles had cattle on the land in the years 1886-1887, and 1888; that Andy Allen offered him $10 an acre and board to clear up this land. Allen told witness that he didn't own it—that Engles had bought it from the State. He stated that he wanted to get possession of the land and was trying to induce witness and another man to enter thereon, saying that ''he had dollars where Engles had cents.'' The first proposition by Allen to witness was made in 1887 and repeated in 1888. Witness knew of J. H. Engles working on the land and having stock there in the years 1886 and 1887.

Another witness testified that he went with Engles to the land in controversy in 1888 or 1889. At that time Engles had several head of cattle and called them up and gave them salt. In 1901 witness was assisting Robert Engles, the guardian of J. H. Engles, in a survey of the land. He was guided most of the way in running the line by an old wire fence which had been partly destroyed by overflow. After that survey he was again on the land and found it enclosed by a fence.

Another witness testified that in 1886 he heard a conversation between Andy Allen and J. H. Engles in which Allen stated that he didn't see why Engles did not give him (Allen) the same chance at the land that he did to one Egner, to whom Engles had sold the land, as witness thought. Engles had surveyed the land, as witness understood, and had put red paint on the trees where they had blazed it out, and they started to fence it, but witness couldn't say that they ever finished it. Witness frequently saw Engles on the land, but never knew of any of the Allens cultivating it. No fence was placed around it by any of the Allens when he was there. In the year 1886 Andy Allen said that he knew of a small

tract of government land lying near the land in contro-
versy and said he guessed Engles would get it, so he
(Allen) had some parties to take it up.

Another witness stated that he became acquainted
with the land in the fall of 1892, and at that time it had
a barbed wire fence around it on three sides; that he
saw Engles repairing the fence which appeared to have
been built two or three years. Lee Allen was helping
Engles to repair the fence; that Engles sold a cow and
calf out of the pasture on the land in controversy in 1892.

Mrs. Engles, the widow of J. H. Engles, testified
that she saw the tract in controversy several times after
1902 and 1903; that there was a fence around it. She
didn't know who put up the fence, but she furnished the
wire. She cultivated the land in 1913 and 1914. There
was a fence around it the first year she cultivated it.
From 1904 until 1913 she went over the land every few
weeks to see that no one was trespassing on it. She
knew that the Allens had been clearing the land all
around it for three years, but they had never touched
this land.

The testimony in behalf of the appellees was sub-
stantially as follows: Witness Sullivan testified that he
had known the land since 1889; that he was in partner-
ship with Lee Allen in the stock business and for several
years had used the land in controversy as a cane pasture,
and he was over it more or less all the time. Andy Allen
had a small portion of it in cultivation thirty-two or
thirty-three years ago. There was a fence which sepa-
rated the cleared land from the pasture. The Allens
had held continuous possession by having it fenced as
stated and by using it as a pasture from 1889 until the
present time. No one else was ever in possession adverse
to the Allens until 1904, when Pete Engles and some
parties went in there and chopped off two or three acres.
Witness informed the attorney of the Allens, and he in-
structed witness to tell them to get off, and they did so.
Witness had farmed there all the time and never knew

of J. H. Engles having any stock in the cane pasture. There was no fence on the east line of the tract in controversy, and none on the south line of the land as late as 1906.

J. F. Shaver testified that he held the lands in controversy under a lease from the Allens and was in possession when the appellants put the fence around it in February, 1919. He had cleared six acres. Appellants cleared more and chopped too close to the river and made it liable to wash. Witness had been down there seven years. During that time the lands described in the complaint, including that in controversy, had been under one enclosure, and it was called the cane pasture. No one had attempted to take possession of the land hostile to the Allens till Crawford came there. Witness had no occasion to go out into the cane pasture in the summer, but there was no cleared land there. In 1904 there was a suit brought by the Engles to recover the land in controversy, which the Allens won. When witness first knew of the land it was in the possession of the Allens. The Engles made one or two efforts to squat and cut timber, but were always ousted.

Davis testified that he had the land in controversy leased from the Allens when the appellants entered upon it. Witness had been on the farm for the past eighteen years. The Allens had been in possession of the tract in controversy for twenty years, and witness had never heard of any one claiming it except at the time of the suit in 1904. Engles did not fence it then, but cut off a little cane and piled it up. The land in controversy had been fenced away from the cultivated land for twenty years. The Allens used it for pasture, and Joe Cain cut some timber from it for the Allens, as witness understood. Some of the land in controversy was the old slough bed and river bed, which had filled in. The thirty-nine-acre tract is in cultivation. Witness cleared part of it. Hall did the first clearing on it, and at that

time the fence went around the high ground bank over to the river. It did not cross the thirty-nine acre tract.

It was admitted by the appellants that the appellees held a regular chain of record title from the government to the lands as described in the complaint, and under those descriptions had paid the taxes on the same to June 3, 1920, the date of the rendition of the decree. It was also admitted that the appellants held a chain of record title through John Engles to the lands described in their answer, who purchased the same at a sale for the taxes of the year 1868.

The court, among other things, found "that the plaintiffs were in possession of the lands claimed by the defendants when the defendants took possession thereof; that the defendants entered upon said lands unlawfully, and that they were committing numerous trespasses thereon; that they were insolvent, each of them, and that they were clearing up a portion of the land so close to the river that it was liable to cause great and irreparable damage by the washing away of the soil, not only to the lands involved in this suit, but to other lands situated adjacent thereto." The court declared the law to be "that the plaintiffs, Ralph A. Allen and Maggie Hensley, are the owners of the lands of which the defendants took possession, and that they are entitled to a decree as prayed for in their complaint." The court entered a decree to that effect, from which is this appeal.

The allegations of the complaint were sufficient to give the chancery court jurisdiction. Having acquired jurisdiction, the court did not err in retaining the same and in determining the issue of title as to the lands in controversy. The appellants admitted that the appellees and their predecessors in title had record title from the government to the lands in controversy, but they contend that they acquired the title by two years' adverse possession of the lands under tax deed from the State. In the view we have of the evidence, it is wholly unnecessary to decide whether or not the tax deed, under

which appellants claimed, was a color of title. For, even if this be conceded, we can not say that the appellants had acquired title by adverse possession. On the contrary, we are convinced that a clear preponderance of the evidence shows that such is not the case. The evidence on this issue is in sharp conflict, and it could serve no useful purpose and would unduly extend this opinion to argue the same.

Our conclusion is that the preponderance of the evidence shows that the appellees had been in actual, open, continuous, exclusive and adverse possession of the tract of land in controversy for many years, holding the same under fence with other pasture lands, and were using same as a pasture, cutting timber and exercising other acts of ownership over it during all the time that the appellants were attempting to acquire possession; that the efforts of the appellants to acquire possession of the property were intermittent and fitful. These efforts were not sufficient to show such continuous and notorious occupation of, and dominion over, the land as to indicate to the true owner an unequivocal intention on the part of appellants to own and exclusively appropiate the lands to their own use. See *Brown v. Bocquin*, 57 Ark. 97; *John Henry Shoe Co.* v. *Williamson*, 64 Ark. 100; *Driver* v. *Martin*, 68 Ark. 551; *Boynton* v. *Ashabranner*, 75 Ark. 415; *Earle Improvement Co.* v. *Chatfield*, 81 Ark. 296.

The decree is correct, and it is therefore affirmed.